# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 18, 2007

Charles R. Fulbruge III
Clerk

No. 06-70022

Jose Alfredo RIVERA

                    Petitioner-Appellee

v.

Nathaniel QUARTERMAN, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division

                    Respondent-Appellant

---

Appeal from the United States District Court
for the Southern District of Texas

---

Before HIGGINBOTHAM, WIENER, and BARKSDALE, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This is a death penalty case from Cameron County, Texas. Texas appeals from a federal grant of habeas relief on Jose Rivera's Atkins claim, arguing that the district court erred in not dismissing his habeas petition as untimely and in finding that Rivera is mentally retarded. We affirm in part, vacate in part, and remand for further proceedings.

I

The dates and sequence of events are important in this appeal. In May 1994, Rivera was convicted and sentenced to death for murdering three-year-old Luis Daniel Blanco. The Texas Court of Criminal Appeals ("CCA") affirmed his

conviction and sentence.  His first state habeas petition was denied by the CCA on December 16, 1998; the federal district court denied his first federal habeas petition on October 3, 2001.  This court denied a Certificate of Appealability on November 27, 2002.  Rivera's execution date was set for August 6, 2003.

On June 20, 2003, Rivera filed a state habeas petition raising an Atkins[1] claim for the first time.  That was the last day to bring an Atkins claim under AEDPA's one-year statute of limitations period.[2]  The CCA dismissed Rivera's habeas petition on July 25, 2003.  Rivera submitted a suggestion for rehearing to the CCA on August 1, 2003, which the CCA rejected on August 5, 2003. Rivera filed, and the state courts rejected, a final state habeas petition on Wednesday, August 6, 2003.

Rivera also sought relief in federal court on his Atkins claim.  On Tuesday, August 5, 2003, he filed a motion for authorization to file a successive petition in this court, as required by 28 U.S.C. § 2244(b)(3)(A).  Rivera submitted a proposed successive application for habeas corpus to be attached to the motion for authorization.  This court denied his first motion on August 6 as failing to make a prima facie showing of mental retardation; this court could not consider all of the evidence of mental retardation Rivera presented because he had not presented that evidence to the state courts.  Rivera then filed another habeas petition with the state court on August 6, presenting the evidence of mental retardation that this court refused to consider.

The state courts rejected his petition the same day, and Rivera filed a second motion for authorization to file a successive petition with this court. Now able to consider all of Rivera's evidence, this court concluded that Rivera had made a prima facie showing of mental retardation, authorized the successive

---

[1] See Atkins v. Virginia, 536 U.S. 304 (2002).

[2] In re Hearn, 376 F.3d 447, 456 n. 11 (5th Cir. 2004); see 28 U.S.C. § 2244(d)(1)(C).

petition on that issue only, and stayed his execution. Rivera filed his habeas petition with the district court on Monday, August 11, 2003.

## II

After Rivera filed his habeas petition in the federal district court, the state moved to dismiss the petition as being untimely. The state argued that Rivera "should have filed the writ in federal court at the absolute latest on Thursday, August 7, 2003." The state also argued in its motion that Rivera was not entitled to any equitable tolling of the statute of limitations.

The district court summarily denied the state's motion to dismiss the petition during a status conference in September 2003, stating: "Denied. You will preserve your exception. We will revisit those matters." At the end of the conference, the state sought to clarify the nature of Judge Vela's denial of its motion to dismiss. The following exchange occurred:

> TEXAS: Your Honor, do I understand that the Court has denied the motion to dismiss filed by the state in its entirety?
>
> COURT: If the state wants to, they can favor me with briefs and the like. I will revisit it. But for right now it stands denied.
>
> TEXAS: That was just what I was going to ask, if you would reconsider
>
> COURT: Yes.

Following the status conference, the parties briefed the mental retardation issue, and Judge Vela held an evidentiary hearing in January 2004. Judge Vela died, however, before rendering a decision. The case was transferred to Judge Hanen, who held a second evidentiary hearing in January 2005. Another round of briefing followed, and Judge Hanen issued a Memorandum Opinion and Order on March 31, 2006, finding Rivera mentally retarded, granting habeas relief, and permanently enjoining him from being executed. However, Judge Hanen did not revisit Judge Vela's timeliness ruling.

3

III

The state first argues that Rivera's petition is time-barred under AEDPA.

A

While Rivera's state habeas petitions were pending, AEDPA's statute of limitations was tolled.[3] Thus, the statute of limitations on Rivera's Atkins claim was tolled through Wednesday, August 6, 2003, the day on which state proceedings ended.[4] However, because Rivera did not file his state Atkins claims until the last day under AEDPA, none of the statute of limitations period remained. Although this court authorized Rivera to file a successive petition raising his Atkins claim on Wednesday, August 6, he waited over the weekend to file the application with the district court – filing on Monday, August 11. Therefore, his application was untimely.[5]

B

Nevertheless, as we have explained, "[a] court can allow an untimely petition to proceed under the doctrine of equitable tolling 'in extraordinary circumstances.' We and the district courts, guided by precedent, must examine each case on its facts to determine whether it presents sufficiently 'rare and exceptional circumstances' to justify equitable tolling."[6] "The doctrine of equitable tolling preserves a plaintiff's claims when strict application of the statute of limitations would be inequitable."[7]

---

[3] See 28 U.S.C. § 2244(d)(2).

[4] See Lookingbill v. Cockrell, 293 F.3d 256, 261 (5th Cir. 2002). The state asks us to limit or distinguish Lookingbill. As doing so is not necessary to the outcome of this case and the state did not raise the argument below, we decline to accept the invitation.

[5] This court previously held that filing a motion for authorization to file a successive petition does not satisfy AEDPA's statute of limitations. See Fierro v. Cockrell, 294 F.3d 674 (5th Cir. 2002).

[6] Fisher v. Johnson, 174 F.3d 710, 713 (5th Cir. 1999) (quoting Davis v. Johnson, 158 F.3d 806, 810, 811 (5th Cir. 1998)) (citations omitted).

[7] Davis, 158 F.3d at 810 (quoting Lambert v. United States, 44 F.3d 296, 298 (5th Cir. 1995)).

Both the state and Rivera would have us decide in the first instance whether equitable tolling is available in this case.[8] Rivera advances three grounds in support of applying the doctrine: (1) that Texas' former two-forum rule delayed by five months the time he could file in state court; (2) that he had no right to counsel, lacked the financial resources to hire counsel, lacked the resources to develop adequately his Atkins claim, and lacked the mental capacity to represent himself pro se; and (3) that a proved Eighth Amendment claim requires that AEDPA's statute of limitations give way or that it justifies equitable tolling. We, however, decline the parties' invitation to decide now whether equitable tolling applies.

The record before the court is not sufficiently developed for us to engage in the fact-intensive determination of whether equitable tolling is appropriate. Judge Vela denied the state's motion to dismiss summarily. Despite his explicit invitation to the state to brief and raise again the timeliness issue, the state did not do so before either him or Judge Hanen. Rather, the state switched litigation strategies and focused on the merits of Rivera's Atkins claim. The consequence of the state's choice is that a factual record upon which this court could base an equitable tolling decision was not developed before either judge. Considering that we affirm the finding that Rivera is mentally retarded, as discussed below, it would be imprudent for us to proceed in the first instance on the question of equitable tolling, decidedly so given Rivera's second bundle of arguments in favor of equitable tolling – that is, the relationship between his retardation and his ability to pursue habeas relief.

The state baldly asserts that Rivera has never been without counsel since the Supreme Court decided Atkins, and thus we need not concern ourselves with the "hypothetical" problem of a mentally retarded person trying to represent himself pro se. The record, however, is not so certain. It does not clearly reflect whether Rivera had counsel through the entire relevant time period; whether

---

[8] See In re Lewis, 484 F.3d 793, 796 n. 8 (5th Cir. 2007).

there were gaps in his representation; if there were gaps, why he was without counsel; and the effects of any gaps in representation on Rivera's ability to complete his Atkins petition. Because of that uncertainty, Lewis, where the court declined to apply equitable tolling, is distinguishable: "Lewis obtained his pro bono counsel on or soon after the day he received notice of his previous counsel's withdrawal, which was March 10, 2003, leaving Lewis with over three months to file his state application."[9]

Nor can we discern why it took over five months for Rivera to file his Atkins claim in the state courts. Perhaps the state is correct in its answer, but it assumes attorney error or lack of diligence – an assumption not tested in a hearing. Nor does the record sufficiently develop what particular obstacles Rivera encountered in assembling his Atkins claim. For example, it is unclear to what extent he was able to access medical records in the state's control, or exactly how his indigence impacted his ability to develop his claim.

All that is clear is that what occurred during the nearly six months between the end of the first federal habeas proceedings and the filing of Rivera's state petition raising his Atkins claim is unclear. Until the underpinnings of what happened and why are made clear, we cannot rule on equitable tolling. Our examples of uncertainties that remain are meant to be illustrative but not exhaustive of what the parties should explore before the district court. Accordingly, we vacate Judge Vela's order denying the state's motion and remand to the district court with instruction to hold an evidentiary hearing, make specific findings, and rule on the issue of equitable tolling.

IV

Although the statute of limitations remains potentially dispositive and we ordinarily would not decide the merits under these circumstances, there are compelling reasons for us to address the merits of Rivera's claim now. First, the merits are squarely before us: we have a developed record, an opinion by the

---

[9] Id. at 797.

district court, and the parties have fully briefed and argued the merits. Judicial economy favors addressing the merits now. Second, the issue of Rivera's retardation is potentially determinative just as the statute of limitations is. We think it unfair to have the district court and the parties grapple with the difficult question of equitable tolling under the looming possibility that it is all for nought as we might later reverse the finding that Rivera is retarded.

Third, and perhaps most important, the merits blend inseparably into the question of equitable tolling here. The bases for equitable tolling that prompt us to remand – in particular the relationship between Rivera's retardation and his ability to pursue habeas relief – are made the more compelling precisely because Rivera has been adjudicated to be retarded. That is, answering whether Rivera is retarded is logically antecedent – if not a core element itself – to determining whether equitable tolling is available. With this entanglement, leaving Rivera's retardation as an unaffirmed hypothetical risks obscuring the issue of equitable tolling on remand, and has the possibility of detrimentally compromising the record needed to review the district court's decision on remand should the case come back to this court.

Finally, because of the case's procedural posture, we cannot avoid deciding whether the district court erred by not giving AEDPA deference to the CCA's decisions. This inquiry takes us far down the road of examining the merits of Rivera's claim because, as the district court observed, the evidence before it was quite similar to the evidence before the CCA.

A

Before considering the district court's findings, we address the state's argument that Judge Hanen "was not empowered to apply a de novo standard"[10] to Rivera's Atkins claim, and was instead required to give AEDPA deference to the CCA's decisions.

---

[10] State-Appellant's Brief at 51.

The CCA denied both of Rivera's Atkins petitions as abuses of the writ, concluding that neither the first petition[11] nor the second supplemented petition[12] made a prima facie showing of retardation. In granting Rivera's motion to file a successive petition after the CCA denied his second petition, this court explained that "characterizing the failure to meet the threshold requirement as an abuse of the writ does not foot the ruling on an independent state ground. This is a determination on the merits."[13] The state argues that, because the CCA's decision was on the merits, AEDPA's deference standards apply. The district court's opinion does not address this issue.

Rivera contends that Morris v. Dretke[14] controls whether deference is due; however, this is not so. Morris held that where new evidence merely supplements an Atkins claim that was presented to the state courts, AEDPA's exhaustion requirement is satisfied. We also noted that, "[i]n cases where the legal question is whether the new evidence a petitioner puts forth for the first time on federal habeas on a particular claim already asserted on state habeas is exhausted under § 2254(b), subparts (d) and (e) of § 2254 concerning 'factual development' are not implicated."[15] This, however, does not mean deference is not due: "The State is correct to argue that our review of the Court of Criminal Appeals' judgment must be conducted under [AEDPA's] deferential standard."[16]

Under AEDPA, if a state court has adjudicated a habeas petitioner's claims on the merits, he may receive relief in the federal courts only where the state court decision "resulted in a decision that was contrary to, or involved an

---

[11] Ex parte Rivera, No. 27065-02, 2003 WL 21752841 (Tex. Crim. App. July 25, 2003).

[12] Ex parte Rivera, No. 27065-03 (Tex. Crim App. Aug. 6, 2003).

[13] In re Rivera, No. 03-41069 (5th Cir. Aug. 6, 2003).

[14] 413 F.3d 484 (5th Cir. 2005).

[15] Id. at 498.

[16] Id. at 501 (Higginbotham, J., concurring); see, e.g., Moreno v. Dretke, 450 F.3d 158 (5th Cir. 2006).

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[17] We apply the same standards as the district court in reviewing a decision of the state court.[18]

A state court's decision is "contrary to" clearly established federal law if "the state court applies a rule that contradicts the governing law announced in Supreme Court cases, or . . . the state court decides a case differently than the Supreme Court did on a set of materially indistinguishable facts."[19] "A state court decision constitutes an 'unreasonable application' of clearly established federal law . . . if the court 'identifies the correct governing legal principle from Supreme Court precedent, but applies that principle to the case in an objectively unreasonable manner.'"[20] If the state court's decision runs afoul of these limits, then federal court review "is unencumbered by the deference AEDPA normally requires."[21] We conclude that the CCA's dismissal of Rivera's second supplemented petition as failing to make a prima facie showing was an unreasonable application of clearly established federal law.

Rivera's second petition contained a report by Dr. Richard Garnett. Garnett analyzed the then-available evidence of Rivera's retardation, which included various TDCJ medical records; records from treatment at a MHMR facility for alcohol and drug abuse; records from the Windham School District; Brownsville public school records; affidavits of teachers at Rivera's school; affidavits of family members of Rivera; letters written by Rivera to family

---

[17] 28 U.S.C. § 2254(d).

[18] Woods v. Quarterman, 493 F.3d 580, 584 (5th Cir. 2007).

[19] Id. (quoting Nelson v. Quarterman, 472 F.3d 287, 292 (5th Cir. 2006)) (internal quotations omitted).

[20] Id. (quoting Nelson, 472 F.3d at 292).

[21] Panetti v. Quarterman, 127 S. Ct. 2842, 2855 (2007).

members; and reports from medical, psychological, and educational sources. Garnett concluded that this evidence "suggest[s] that Mr. Rivera is mentally retarded and there is no information which could rule out the diagnosis."

Garnett explained that Rivera had never taken a valid, full length IQ test, and that the tests he had taken to date were "not valid indicators of intellectual functioning." Based on a review of Rivera's school records and achievement testing, Garnett stated that "as an adult, Mr. Rivera was performing academically at the level of a 10 year old." Garnett specifically noted that Rivera needed to take a full length, reliable IQ test.

Garnett's report also indicated that the evidence suggested that Rivera had deficits in adaptive functioning in multiple areas, including: functional academic skills, work, self direction, communication, health, and self care. The evidence further indicated onset prior to age 18.

The report was directly responsive to the gaps that the CCA identified in denying Rivera's first Atkins habeas petition. As to intellectual functioning, the report went beyond mere recitation of grades to describe Rivera's sustained pattern of academic difficulties, and it analyzed Rivera's performance on various achievement tests while in school. The report explained why the IQ tests Rivera had taken to date could not be relied on, and also detailed deficits in adaptive functioning beyond Rivera's work problems.[22]

The then-available evidence and Dr. Garnett's report raised serious questions about Rivera's possible retardation. Faced only with the threshold question of whether to allow Rivera's claim to proceed, it was unreasonable on the record before the CCA to reject Rivera's Atkins claim as failing to even establish a prima facie case – especially when viewed through the prism of

---

[22] In dismissing Rivera's first Atkins petition, the CCA described the evidence regarding Rivera's adaptive functioning as follows: "Other than allegations that he did not work much, there is no evidence of deficits in adaptive behavior."

Atkins' command that "the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender."[23]

The district court's ruling that Rivera had exhausted his Atkins claim before the state court – which the state understandably does not discuss – strengthens the conclusion that the CCA's decision was unreasonable. We explained in Morris that the presentation of "evidence [in the federal courts] that places [a petitioner's] claims in a significantly different legal posture must first be presented to the state courts."[24] Here, the district court held that although it had evidence before it that was not presented to the state court, there was no exhaustion problem:

> [T]he quality of the evidence presented in support of Rivera's habeas petition is strikingly similar both in terms of the type and the amount of factual presentations made in state court, and in terms of the qualitative improvement in the evidence made in the federal Atkins presentation due to the additional evidence obtained after the state habeas proceedings had concluded.

In short, the district court was considering a body of evidence that did not "fundamentally alter"[25] Rivera's retardation claim. From the "strikingly similar" evidence, the district court found that Rivera was retarded. That this body of evidence can support a finding of retardation, which we affirm below, points strongly to the conclusion that the CCA's decision that Rivera had not made a prima facie showing was unreasonable.

The unreasonableness of the CCA's decision is further compounded by its procedural effect: the finding that Rivera had not made a prima facie showing deprived Rivera of the opportunity to develop fully the substance of his claim before the state courts. Atkins, like Ford v. Wainwright,[26] "[left] to the State[s]

---

[23] Atkins, 536 U.S. at 321.

[24] 413 F.3d at 491 (quoting Anderson v. Johnson, 338 F.3d 382, 387 (5th Cir. 2003)).

[25] Id.

[26] 477 U.S. 399 (1986).

the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences."[27] Ford is instructive because of the similarity of the competency and mental retardation issues: both decisions affirmatively limit the class of persons who are death penalty eligible. While Atkins itself did not specifically impose the sort of procedural requirements that Ford mandates, neither did Atkins purport to sweep away the protections of due process.

Under Ford, "[o]nce a prisoner seeking a stay of execution has made a 'substantial threshold showing of insanity,' the protection afforded by procedural due process includes a 'fair hearing' in accord with fundamental fairness."[28] As Justice Powell explained, due process does not require a full trial on the merits, but a process that affords the prisoner an "opportunity to be heard."[29]

For our purposes, we are concerned with the Supreme Court's application of Ford in Panetti v. Quarterman. In Panetti, the prisoner had made a "substantial showing of incompetency," but according to the prisoner, the state failed to provide him with procedures in conformity with Ford to develop his claim. This failure, the prisoner argued, rendered the state's decision denying his incompetency claim an unreasonable application of clearly established federal law. The Supreme Court agreed:

> The state court's failure to provide the procedures mandated by Ford constituted an unreasonable application of clearly established law as determined by this Court. It is uncontested that petitioner made a substantial showing of incompetency. This showing entitled him to, among other things, an adequate means by which to submit expert psychiatric evidence in response to the evidence that had been solicited by the state court. And it is clear from the record that the state court reached its competency determination after failing

---

[27] Atkins, 536 U.S. at 317 (quoting Ford, 477 U.S. at 405, 416-17).

[28] Panetti, 127 S. Ct. at 2856 (quoting Ford, 477 U.S. at 426 (Powell, J., concurring in part and concurring in the judgment)).

[29] Ford, 477 U.S. at 424 (Powell, J., concurring in part and concurring in the judgment).

to provide petitioner with this process . . . . As a result of this error, our review of petitioner's underlying incompetency claim is unencumbered by the deference AEDPA normally requires.[30]

Even though Atkins did not specifically mandate any set of procedures, it was decided against the backdrop of the Supreme Court's and lower court's due process jurisprudence. The lesson we draw from Panetti is that, where a petitioner has made a prima facie showing of retardation as Rivera did, the state court's failure to provide him with the opportunity to develop his claim deprives the state court's decision of the deference normally due.[31]

The Court's decision in Ake v. Oklahoma[32] is relevant to the extent that Texas' abuse of the writ doctrine is potentially a procedural bar to our review.[33] The substantive issue in Ake was whether the Constitution requires a state to provide assistance to an indigent defendant when there is a serious question about the defendant's sanity at the time of the offense. However, the Court faced a threshold issue of whether an adequate and independent state ground – the state's waiver rule – deprived it of jurisdiction. The Court held that it did have jurisdiction as the application of the state's procedural rule turned on an antecedent determination of federal law: "Before applying the waiver doctrine to a constitutional question, the state court must rule, either explicitly or

---

[30] Panetti, 127 S. Ct. at 2855.

[31] See also id. at 2859 ("Here, due to the state court's unreasonable application of Ford, the factfinding procedures upon which the court relied were 'not adequate for reaching reasonably correct results' or, at a minimum, resulted in a process that appeared to be 'seriously inadequate for the ascertainment of the truth.' We therefore consider petitioner's claim on the merits and without deferring to the state court's finding of competency." (citation omitted)); Taylor v. Horn, __ F.3d __, No. 04-9016, 2007 WL 2728668, at *34 n.12 (3d Cir. Sept. 20, 2007) ("We appreciate that if a competency hearing was not held when it ought to have been, in accordance with minimal federal standards of procedural due process, then no deference is due to a state court's competency determination.").

[32] 470 U.S. 68 (1985).

[33] The state did not raise the issue. However, because it implicates our jurisdiction, we address the question.

implicitly, on the merits of the constitutional question."[34]  The necessity of examining the merits of the federal law issue to decide the applicability of the state procedural rule meant that "the state-law prong of the court's holding is not independent of federal law."[35]

The application of Texas' abuse of the writ doctrine to Atkins claims is entangled in federal law in much the same way as Oklahoma's waiver doctrine was in Ake; "in the Atkins context, Texas courts have imported an antecedent showing of 'sufficient specific facts' to merit further review, rendering dismissal of such claims [as abuses of the writ] a decision on the merits."[36]  That is, to decide whether an Atkins claim is an abuse of the writ, the CCA examines the substance of the claim to see if it establishes a prima facie case of retardation, and only upon deciding that question can the state court decide whether remand is appropriate.[37]  Thus, a decision that an Atkins petition does not make a prima facie showing – and is, therefore, an abuse of the writ – is not an independent state law ground.

This does not mean that states may not use procedural devices and doctrines – independent and adequate state law grounds – to ferret out frivolous

---

[34] Ake, 470 U.S. at 75.

[35] Id.

[36] Morris, 413 F.3d at 500 n. 4 (Higginbotham, J., concurring).

[37] For example, in rejecting Rivera's first petition presenting his Atkins claim, the CCA concluded by stating that "[a] remand of a subsequent application raising an Atkins claim is appropriate when an applicant sets out sufficient facts to rase a bona fide claim of mental retardation, but in the instant cause [Rivera] has failed to make this threshold showing. Because of [Rivera's] failure to produce 'sufficient specific facts' to support an Atkins claim, we dismiss [Rivera's] subsequent writ application as an abuse of the writ . . . ."  Of course, this court has held in other circumstances that Texas' abuse of the writ doctrine is an adequate and independent state law ground, see Barrientes v. Johnson, 221 F.3d 741, 759-61 (5th Cir. 2000); Emery v. Johnson, 139 F.3d 191, 195-96 (5th Cir. 1997), but the merits showing now incorporated for Atkins claims changes the character of the doctrine.

or meritless claims, thereby preventing federal review.[38] Nor does it mean that states must give hearings to persons with such claims as Ford makes clear. But it does mean that, where the threshold a state sets turns on a merits determination of federal law or fails to make clear that it is procedural in nature, that decision is reviewable.[39] Although Texas' abuse of the writ doctrine is superficially procedural in that it has a procedural effect, determining which claims are remanded to the state trial courts for further development, it steps beyond a procedural determination to examine the merits of an Atkins claim. For an Atkins claim, the merits determination is at a minimum "interwoven" with the constitutional prohibition against executing the mentally retarded.[40]

This case stands in contrast to Moreno v. Dretke.[41] The CCA concluded that Moreno failed to make a prima facie showing of retardation, dismissing his petition as an abuse of writ. This court affirmed the district court's holding that the CCA's decision was entitled to AEDPA deference. Moreno attempted to show subaverage intellectual functioning by submitting an IQ test taken in 2003 on which he scored a 64.[42] The test administrator, however, qualified his test score,

---

[38] See Coleman v. Thompson, 501 U.S. 722, 729-30 (1991); Wright v. Quarterman, 470 F.3d 581, 586 (5th Cir. 2006) ("A federal court may not grant a petition for a writ of habeas corpus where the state court expressly denied the claim based on an independent and adequate state procedural rule.").

[39] See Harris v. Reed, 489 U.S. 255, 263-65 (1989) ("Having extended the adequate and independent state ground doctrine to habeas cases, we now extend to habeas review the 'plain statement' rule for determining whether a state court has relied on an adequate and independent state ground."); Hogue v. Johnson, 131 F.3d 466, 492-93 (5th Cir. 1997).

[40] Hogue, 131 F.3d at 493 ("In Young we likewise recognized that a necessary 'predicate' to the application of the Harris rule is that the decision of the last state court to which the petitioner presented his federal claims most fairly appear to rest primarily on federal law or to be interwoven with federal law." (quoting Young v. Herring, 938 F.2d 543, 553 (5th Cir. 1991) (en banc)) (internal quotation marks omitted)).

[41] 450 F.3d 158 (5th Cir. 2006).

[42] Id. at 164.

concluding that the "results probably reflect the lowest level of his abilities."[43] The test administrator commented that Moreno may not have given his best effort and may have "exaggerated any possible deficits."[44] The administrator went on to comment that "Moreno's speech was 'free of articulation errors,' he expressed himself appropriately and coherently, and his 'cognitive processing speed was unremarkable.'"[45] Moreno attempted to demonstrate deficits in adaptive functioning through a history of substance abuse and his attendance in special education classes. However, the "only evidentiary support for that claim was the psychologist's report reciting Moreno's self-reported educational background. He could not identify any specific special education classes or provide documentation of those classes."[46] In contrast, there was "substantial" evidence that Moreno did not suffer from deficits in adaptive functioning.

The evidence Rivera presented to make his prima facie showing of retardation was much stronger than Moreno's. As summarized in Garnett's report, Rivera presented school records documenting a long, sustained pattern of academic difficulties. And, again, Rivera's achievement scores demonstrated that "as an adult, Mr. Rivera was performing academically at the level of a 10 year old." Garnett also concluded that the available evidence indicated deficits in adaptive functioning other than academic achievement, such as in work, health, and self care. Garnett's analysis of Rivera's evidence and his conclusion that it "suggest[s] that Mr. Rivera is mentally retarded and there is no information which could rule out the diagnosis" was itself potent evidence.

As the CCA's decision was an unreasonable application of federal law, the district court did not err by considering Rivera's claim without deference to it.

---

[43] Id.

[44] Id.

[45] Id.

[46] Id. (emphasis added).

B

The state next argues that the district court erred in finding that Rivera was mentally retarded. The test for mental retardation is (1) significantly subaverage intellectual functioning; (2) accompanied by related limitations in adaptive functioning; and (3) onset prior to the age of eighteen.[47] We review the district court's factual determinations for clear error, while we review de novo conclusions of law.[48] "A finding is clearly erroneous only if it is implausible in the light of the record considered as a whole."[49]

C

The district court did not clearly err in finding that Rivera suffered from significantly subaverage intellectual functioning. Rivera scored a 68 on the Wechsler Adult Intelligence Scales (WAIS-III) IQ test, a test which both parties agree is the best full-scale IQ test available in English.[50] Texas argues that Rivera's expert misinterpreted this score. According to Texas, Rivera's verbal IQ score of 66 is unreliable, and dragged down his overall result. Texas concedes that Rivera speaks English, but explains that because Rivera is bilingual, he "processes English and Spanish in competition." This competition, Texas' expert argued, made Rivera's verbal score unreliably low. Texas' expert conceded that the IQ test was properly given in English, but then testified that a responsible clinician would have "qualified" the results in light of cultural factors, such as language. In support, he noted that the WAIS-III record form includes a section titled "Behavior Observations," which asks, "Is English native language? If not,

---

[47] See Atkins, 536 U.S. at 308 n. 3, 318; In re Salazar, 443 F.3d 430, 432 (5th Cir. 2006); Ex parte Briseno, 135 S.W.3d 1, 7-8 (Tex. Crim. App. 2004).

[48] Woods, 493 F.3d at 584.

[49] St. Aubin v. Quarterman, 470 F.3d 1096, 1101 (5th Cir. 2006).

[50] See also Atkins, 536 U.S. at 309 n. 5 (describing "the Wechsler Adult Intelligence Scales test (WAIS-III)[ as] the standard instrument in the United States for assessing intellectual functioning").

indicate examinee's level of fluency; indicate expressive/receptive problems, unusual verbalizations."

The district court rejected this testimony, crediting instead the testimony of Dr. Gilda Kessner, the psychiatrist who administered the IQ test. Kessner testified that she followed the appropriate process for determining whether the test could be administered in English. She testified that she spoke with Rivera before the test, discussing his background, his substance abuse history, his work history, and his ability to communicate with the guards. She testified that during the test he spoke in English, she had no communication problems with him, and that if she thought his English was a problem, she would not have given him the test. Garnett offered testimony that supported Kessner's testimony, and three state witnesses, prison guards and counselors, also testified that they converse with Rivera in English and without communication difficulties.

Rivera also notes that the WAIS-III takes into account bilingual examinees, as it was normed to include age groups, geographic regions, gender, and Hispanic and Black Americans. Because of this, Rivera argues, it would alter the reliability of the test to "qualify" the verbal score.

The district court did not clearly err in crediting the testimony of the doctor who administered the IQ test. As Texas' expert acknowledged, "the clinician must ultimately make the decision . . . . It must come down to clinical judgment"; "it has to come down to a clinician's decision, even with test scores, even with the history."

Texas next argues that the district court erred in rejecting four pre-Atkins IQ scores of 70, 85, 92, and 80. The scores were not from full-scale Wechsler tests. The latter three scores resulted from screening tests used in the prison system, and the score of 70 was mentioned in Rivera's school records. Texas concedes that the two Beta-II scores, 85 and 92, correlate only moderately with the Wechsler tests. According to the state's expert, "[T]he correlation coefficients

between the Beta-II IQs and WAIS Full Scale IQs ranged between .64 and .66. These moderate range coefficients are quite acceptable, especially when used as a screening instrument." Texas' expert also cited a study that found that Beta tests tend to underestimate intelligence. Texas defends the short form Wechsler score of 80, noting that although the short form is "considered less reliable," its scores correlates closely with long form scores.

Rivera replies that the district court did not "reject" these pre-Atkins tests, but it simply gave them less weight. The district court stated that "each score should be of some, but not controlling, weight" because of the "paucity of details surrounding their administration and scoring." The district court "note[d] that the circumstances surrounding the[] administration [of the four tests] are either totally unknown or were less than ideal." The expert testimony and literature before the court "suggest[ed] that one sacrifices accuracy for speed when one administers tests designed for screening purposes." Garnett testified that IQ tests given in the criminal justice system "don't hold much weight" because of the wide variation.

The district court concluded that the pre-Atkins IQ tests did not have "a degree of sufficient reliability to satisfy this Court," but that does not mean the court "rejected" the tests. Rather, the district court considered the available IQ test data and offered a reasoned basis for how it weighed the tests in its analysis. We find no clear error in the district court's determination that Rivera has significantly subaverage intellectual functioning.

D

The district court did not clearly err in finding that Rivera suffered from related limitations in adaptive functioning. There was evidence that Rivera was always dirty, slept outside underneath his house, did not play games or read, consistently had academic problems, and was unemployed. The district court found that Rivera displayed adaptive deficits prior to the age of 18 in the areas of self-care, social skills, home living, and functional academics.

The state does not dispute that Rivera has adaptive limitations.[51]  As its expert testified, Rivera has adaptive limitations in more than two categories. Rather, Texas argues that these adaptive deficits might have been attributable to Rivera's abuse of inhalants, not to his mental retardation, and that the district court did not find otherwise.  Texas argues that there is no proof that Rivera's drug use caused his mental retardation before the age of 18, and that it is just as likely that his early adaptive deficits were manifestations of an intelligent man on drugs.  Even the district court acknowledged this, Texas argues, when it stated that "deficits may or may not have been caused by Rivera's diminished intellectual capacity.  It is just as likely that these adaptive deficits were caused by his long-term drug abuse."

We read this quote charitably, in support of the district court's own ruling. The district court was likely distinguishing only between etiologies, remarking that some of the deficits were caused by mental retardation from inhalants, and some were caused by mental retardation from other factors.  Retardation has, as the experts in this case all agreed, a number of etiologies.[52]

As the CCA has noted, the adaptive behavior criteria are "exceedingly subjective."[53]  The district courts each held extensive evidentiary hearings, which included testimony on this issue from, among other witnesses, Rivera's family members and teachers, and multiple experts.  That this case presents, in Judge Hanen's words, "a close call" strengthens the need to be mindful of the district

---

[51] See State-Appellant's Brief at 47 ("Although the Director agrees that Rivera's drug history helps explain, in part, his adaptive deficits . . . the court errs in overstating the impact of the record evidence."); id. at 48 ("The Director has always maintained that two chief factors – Rivera's inhalant abuse and his antisocial personality – negatively impacted almost all categories of adaptive functioning.").

[52] The Supreme Court noted in Atkins that mental retardation "has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." 536 U.S. at 309 n. 3 (quoting Diagnostic & Statistical Manual of Mental Disorders 41 (4th ed. 2000)).

[53] Briseno, 135 S.W.3d at 8.

court's conclusions. Judge Hanen, having actually presided over the second evidentiary hearing, is in a better position than this court to judge and weigh the credibility of the witnesses who testified on the extent, duration, and causes of Rivera's adaptive functioning limitations.[54]

Based on the expert testimony, testimony of teachers and family, and the documentary evidence, the district court's determination is not implausible and, therefore, survives clear error review.

E

Nor did the district court clearly err in finding onset before age 18. The district court specifically found that "Rivera displayed adaptive deficits prior to the age of 18." And, although Rivera did not take the WAIS-III test prior to age 18, the district court found that the combination of his score of 68, other evidence of Rivera's intellectual functioning, and his performance in school "establish that Rivera had significantly subaverage intellectual functioning prior to the age of 18." The record provides sufficient support for both findings.

As the district court did not clearly err in determining Rivera had significantly subaverage intellectual functioning, related adaptive functioning deficits, and onset before 18 – in short, that Rivera satisfied all three prongs for demonstrating mental retardation under Briseno – we affirm the finding that Rivera is mentally retarded.

V

For the foregoing reasons, we AFFIRM in part, VACATE in part, and REMAND for further proceedings.

---

[54] See id. at 9 (recognizing the role of experts in determining mental retardation, but cautioning that "the ultimate issue of whether this person is, in fact, mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact, based upon all of the evidence and determinations of credibility" (emphasis added)).