

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. WR-42,639-03

### EX PARTE ROBERT CHARLES LADD, Applicant

### ON APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS AND MOTION TO STAY THE EXECUTION IN CAUSE NO. 114-80305-97-C IN THE 114TH JUDICIAL DISTRICT COURT SMITH COUNTY

**ALCALA, J., filed a concurring statement.**

### CONCURRING STATEMENT

Robert Charles Ladd, applicant, has filed a subsequent application for a writ of habeas corpus challenging Texas's procedures for determining intellectual disability in the wake of *Hall v. Florida*, 134 S. Ct. 1986, 2001 (2014). Applicant asserts that his present claim falls under Section 5(a)(1) of Article 11.071 of the Texas Code of Criminal Procedure, which provides that the merits of a subsequent application for a writ of habeas corpus may be considered if "the current claims and issues have not been and could not have been presented previously . . . because the . . . legal basis for the claim was unavailable on the date the

applicant filed the previous application." TEX. CODE CRIM. PROC. art. 11.071, § 5(a)(1). Applicant urges this Court to reconsider its holding in *Ex parte Briseno* in light of *Hall* and to resolve his application on the merits. *See Ex parte Briseno*, 135 S.W.3d 1, 5-8 (Tex. Crim. App. 2004). Although this Court's discussion of certain "factors" in *Briseno* may warrant reevaluation at some future point, I do not believe that the holding in *Hall* is inconsistent with this Court's overall standard for determining mental retardation as set forth in *Briseno*.[1] Furthermore, after reviewing the analysis in the opinions by the federal courts, I conclude that their analysis of the law is consistent with *Hall* in that it considers adaptive deficits as well as applicant's IQ score. Because applicant has failed to present a new legal basis to overcome the procedural hurdle of Article 11.071, Section 5(a)(1) of the Code of Criminal Procedure, I will join this Court's order dismissing applicant's application for a writ of habeas corpus and denying the motion for a stay of execution.

## I. Background

In 1978, applicant was convicted of murdering a woman and her two children and then setting her house on fire. After serving 16 years of a 40-year prison sentence, he was released from prison. On September 25, 1996, Vicki Ann Garner was found dead in her home. Garner had been raped and strangled to death. In addition, her home was set on fire.[2] In 1997, a jury

---

[1] I recognize that the preferred terminology for mental retardation is now "intellectual disability." However, because the term mental retardation has been previously used in this case and by relevant legal authority, I use the two terms interchangeably.

[2] The information contained in the background section is taken largely from the Fifth Circuit's opinion in *Ladd v. Stephens*, 748 F.3d 637, 639 (5th Cir. 2014).

convicted applicant of capital murder and imposed the death penalty. A direct appeal then followed, which was denied in 1999.

Applicant filed his first application for habeas relief, in which he alleged that his counsel was ineffective for failing to raise evidence of mental retardation during the punishment phase. The habeas court held an evidentiary hearing, at which applicant presented testimony by his trial counsel, but did not present testimony from a psychiatric expert. The State presented its psychologist and psychiatrist who had both testified at trial that applicant presented a future danger. These experts generally opined that they would discount applicant's prior IQ score of 67, explaining that they did not know enough about the administration of the test and that such a result was inconsistent with his later academic achievement. But neither expert had tested applicant's IQ, nor had they otherwise examined him for mental retardation; rather, their testimony centered on their conclusion that the additional information obtained about Ladd would not have changed their expert opinions regarding his future dangerousness. The habeas court then issued its findings of fact and conclusions of law, wherein it concluded:

> The information that Applicant had scored 67 on an IQ test as a juvenile did not support an inference that Applicant was mentally retarded because of a higher IQ score, the completion of the GED program and completion of barber school as an adult. . . . The information that Applicant scored 67 on an IQ test was not mitigating because of the other information that Applicant was not mentally retarded.

This Court denied applicant's petition for habeas relief in 1999. *Ex parte Ladd,* No. 42,639-01 (Tex. Crim. App. 1999).

Applicant filed his first petition for federal habeas relief in 2001, and the federal district court denied relief. His application raised the claim that he received ineffective assistance of counsel because his attorney had not raised evidence of his mental retardation during the punishment phase. The Fifth Circuit affirmed, concluding that "the Texas court was well-within the bounds of AEDPA reasonableness in concluding that Ladd suffered no prejudice." *Ladd v. Cockrell,* 311 F.3d 349, 361 (5th Cir. 2002).

Following the Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), applicant filed his second application for state habeas relief in April 2003, arguing that he was categorically excluded from the death penalty because of mental retardation. In support of this claim, he attached several exhibits, including: (1) documentation from his childhood institutionalization in the Gatesville State School, where his IQ had been tested at 67; (2) psychiatric notes from this institutionalization wherein the psychiatrist noted that applicant is "rather obviously retarded" and had "mental retardation, mild to moderate"; (3) institutionalization records showing that he was functioning below his grade level in basic academic skills and had social development problems; and (4) documentation that as a child, he was prescribed Mellaril, an anti-psychotic medication, to control his impulsive behavior.

Arguing that he had set forth a prima facie *Atkins* claim, applicant requested an evidentiary hearing to refute any evidence the State might offer and to factually develop his claim. Without granting an evidentiary hearing or opportunity to develop his claim, this Court dismissed the application, explaining that he had failed to plead sufficient facts to permit a

successive writ.

Applicant sought authorization from the Fifth Circuit to file a second petition for habeas relief in the federal district court. That court authorized the successive writ, and in June 2003, applicant filed his second petition for federal habeas relief. The federal district court conducted an evidentiary hearing on his claims. He presented several witnesses: Richard Garnett, a licensed professional counselor; Lubertha Cephus, his mother's first cousin; Russell Pinckard, a death row corrections officer; and Nelma Thomas, his sister.

Garnett testified that, in his expert opinion, applicant was mentally retarded. First, Garnett explained that applicant had significantly sub-average intellectual functioning. Garnett based this conclusion on applicant's IQ score of 67 when he was tested at age 13 by the Texas Youth Commission. Moreover, Garnett explained that the Texas Youth Commission's psychiatrist, Phillip Ash, noted that applicant appeared mentally retarded. In addition, Garnett noted that applicant had a low birth weight, consistent with fetal alcohol syndrome. Garnett acknowledged that Ladd later received an IQ score of 86, but he dismissed that higher score on the basis that it was on a less comprehensive IQ test, the Beta test, which is not as accurate as the previously administered Wechsler test. Garnett discounted a more recent Wechsler test IQ score of 60 because there were signs of malingering.

Second, Garnett testified that applicant had significant adaptive skills deficits. In particular, Garnett testified that Ladd had deficits with money concepts, work-related skills, using community resources, communications skills, and social skills. In addition, Garnett

testified that applicant's deficits were properly attributed to mental retardation, rather than anti-social personality disorder. Although Garnett acknowledged that he could not use any evaluative instruments for measuring the adaptive skills of an incarcerated individual, he explained that he was able to make this assessment based on his clinical judgment and experience. Additionally, Garnett discounted the facts that applicant had obtained a G.E.D. and learned to play chess by explaining that those achievements were not outside the capacity of a mildly intellectually disabled person. Although he also acknowledged that applicant had written many letters, Garnett explained that, based on his conversations with applicant, he believed that applicant had received substantial assistance in writing the letters. Third, Garnett testified that, given applicant's childhood IQ score of 67 and family reports of adaptive functioning deficits, these deficits developed prior to the time when applicant turned eighteen years old.

On cross-examination, the State elicited from Garnett that (1) applicant was a latch-key kid who had been able to take care of himself; (2) by eleven years old, applicant could handle money; (3) his failure to make friends during childhood may have been a product of his anti-social personality disorder, and not intellectual disability; (4) Ladd's reading-ability tests had scores above the tenth-grade level, as compared to the typical reading scores for intellectually disabled individuals, which generally indicate an inability to read above a seventh-grade level; (5) he had successfully completed vocational training programs in prison; and (6) he was successful working in a structured environment when he

was not in prison.

Lubertha Cephus testified that applicant's mother drank heavily while pregnant with him. His sister, Nelma Thomas, testified that he had problems understanding the concepts of games as a child: she explained that he did not understand the concept of suits in card games and that he did not understand the need to run to first base while playing kickball. In addition, Thomas testified that applicant often failed to dress himself appropriately for the weather when he was twelve to fourteen years old, and that when her mother sent him to the store, he could not remember what he was supposed to purchase.

The State presented several witnesses: Al Matson, the manager of the vocational program at which applicant had worked; Howard Alexander, a prison barber instructor; and Dr. Thomas Allen, a forensic psychologist. Matson explained that he managed the vocational division of the Andrews Center, a community mental health and healthcare center for intellectually disabled individuals. Matson testified that applicant was referred to the Andrews Center from a substance-abuse facility and was a capable worker. Matson explained that applicant was placed into some of the more challenging positions, such as line leader and quality control. During the course of his employment, applicant could operate an ultrasonic welding machine, set up electronic weighing scales, and operate a forklift. Matson testified that applicant did not require any special assistance or supervision and would have been promoted but for his criminal background. Although he was initially started at below minimum wage, applicant received several raises in the course of his work, resulting in

above-minimum wage payment. These funds were paid into a trust account, but the Andrews Center used trust accounts for both intellectually-disabled workers and non-intellectually-disabled workers. Matson explained that applicant was eventually fired because of problems with absenteeism and confrontations with supervisors.

Howard Alexander testified that he taught a vocational barber training program in prison. The program required at least a seventh-grade education, and, in Alexander's opinion, the program could not be completed by anyone with serious learning deficiencies. Although Alexander does not remember instructing applicant, Alexander's records indicate that applicant completed the state barber exam and was one of Alexander's better students.

Dr. Thomas Allen, a forensic psychologist, testified that in his opinion applicant was not mentally retarded. First, Dr. Allen explained that he did not trust the IQ score of 67 administered when applicant was 13 years of age because applicant had a propensity for "prevarication" and low motivation, and there were no notes as to whether the degree of his effort on the examination was observed. Relatedly, Dr. Allen explained that the IQ score of 86, although only measured by a screening tool, was instructive, as it placed applicant within the average range of prisoners screened. Similar to Garnett, Dr. Allen opined that the recent score of 60 was unreliable because of malingering.

Second, Dr. Allen testified that applicant's possible adaptive deficits were properly explained as being caused by an anti-social personality disorder because the behavioral observations predominantly focused on aggression and anti-social conduct, not on behavioral

deficits typically associated with intellectual disability.

Third, Dr. Allen explained that he administered the Vineland Adaptive Skills Inventory, which he modified to adapt to applicant. Although this inventory has not been normed on prisoners, Dr. Allen explained that applicant's score placed him well within the middle, or average, range of the population. Reviewing applicant's history, Dr. Allen opined that his adaptive deficits, including deficits related to functional academics, using community resources, inter-personal skills, and communications skills, were due to behavioral problems and were not attributable to intellectual disability. Finally, Dr. Allen opined that, although possible, it would be very unusual for someone to suffer from both intellectual disability and anti-social personality disorder.

Following the evidentiary hearing, the federal district court issued a memorandum opinion and order, wherein it concluded that it found the State's expert witness to be more persuasive. Accordingly, the district court denied the application in February 2013, concluding that applicant had failed to establish by a preponderance of the evidence that he was intellectually disabled. The district court then granted a certificate of appealability.

Although it was first persuaded that applicant's lower IQ score indicated sub-average intellectual functioning, the federal district court determined that applicant had not established an *Atkins* claim on the basis of its second consideration that he had failed to show that his deficits in adaptive functioning were significant. First, the district court found "by a preponderance of the evidence that Ladd has significantly sub-average intellectual

functioning." *Ladd v. Thaler*, No. 1:03cv239, 2013 WL 593927, at *8 (E.D. Tex. Feb. 13, 2013). The district court explained that this conclusion was compelled by (1) applicant's score of 67 on a Wechsler IQ test at age 13, and (2) the agreement by both parties' experts that both subsequently administered IQ tests, where applicant achieved scores of 86 and 60, are less reliable because the higher score of 86 was achieved on a less accurate test instrument and the lower score of 60 was likely the result of malingering. *Id.*

Second, the district court found that "Ladd has failed to establish by a preponderance of the evidence that any of his deficits in adaptive functioning are significant." *Id.* at *10. The district court explained that, although both applicant's and the State's experts agreed that he "demonstrated deficits in adaptive behavior in functional academics, social skills, work, and communication," the experts disagreed as to whether these deficits were properly attributed to his mental retardation or to his anti-social personality disorder. *Id.* at *8. The district court considered the experts' testimony as to each adaptive deficit and decided that the State's expert's testimony was more persuasive. It then concluded that, as to his deficits in functional academics, social skills, and work, applicant's deficits were properly attributed to his anti-social personality disorder. As to his deficit in adaptive behavior in communications skills, the district court explained that neither expert claimed that a deficiency in this skill could be related to his anti-social personality disorder, and it determined that this deficit was related to his sub-average intellectual functioning. Although applicant's communications skills weighed in favor of a finding of intellectual disability in

adaptive skills, the district court nonetheless determined that applicant had not established intellectual disability in that he failed to show that his other deficits in functional academics, social skills, and work were attributable to intellectual disability rather than to his anti-social personality disorder. In addition, the district court found that, to the extent applicant has deficits in his adaptive behavior, these deficits are not significant limitations. In this regard, the district court found the State's expert's testimony to be more credible and persuasive.

On appeal to the Fifth Circuit, that court upheld the district court's order, explaining that the district court did not err in finding that applicant was not intellectually disabled. *Ladd v. Stephens*, 748 F.3d 637, 748 (5th Cir. 2014). It observed that the district court, having heard and evaluated the testimony of each expert, found the State's expert to be more persuasive. *Id.* Considering that the district court was in the better position to reach such a conclusion and that such a conclusion could be supported by the evidence, the Fifth Circuit held that the district court's determination was plausible and thus survived clear-error review. *Id.*

## II. *Briseno* Largely Undisturbed by *Hall*

In *Ex parte Briseno*, this Court stated, "Until the Texas Legislature provides an alternate statutory definition of 'mental retardation' for use in capital sentencing, we will follow the AAMR [American Association on Mental Retardation] or section 591.003(13) criteria in addressing *Atkins* mental retardation claims." *Briseno,* 135 S.W.3d at 8; TEX. HEALTH & SAFETY CODE § 591.003(13). "Under the AAMR definition, mental retardation

is a disability characterized by: (1) 'significantly subaverage' general intellectual functioning; (2) accompanied by 'related' limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." *Briseno*, 135 S.W.3d at 7. Section 591.003(13) of the Texas Health and Safety Code stated, "'[M]ental retardation' means significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." TEX. HEALTH & SAFETY CODE § 591.003(13). This Court determined that "the ultimate issue of whether [a] person is, in fact, mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact, based upon all of the evidence and determinations of credibility." *Briseno*, 135 S.W.3d at 9. In considering the totality of the evidence, however, this Court provided some "evidentiary factors which factfinders in the criminal trial context might also focus upon in weighing evidence as indicative of mental retardation or of a personality disorder." *Id*. at 8. Because this Court used the word "might" in setting forth the factors and also indicated that the ultimate test was based on the totality of the circumstances, these "evidentiary factors" were not intended as a definitive test for assessing intellectual disability, as they appeared to be merely suggestive. *See id*. In denying relief in *Briseno*, this Court stated, "In sum, we conclude that, while there is expert opinion testimony in this record that would support a finding of mental retardation, there is also ample evidence, including expert and lay opinion testimony, as well as written records to support the trial court's finding that applicant failed to prove that he is mentally retarded." *Id*. at 18.

Applicant criticizes the *Briseno* factors in his current application for habeas relief, arguing that they are in conflict with *Hall*. *Hall* was decided by the Supreme Court less than one year ago, and about a decade after *Briseno*. *Hall*, 134 S. Ct. at 2001. Nothing in the holding of *Hall*, however, appears to conflict with this Court's approach in *Briseno*. *Hall* held that Florida, by defining intellectual disability to require an IQ test score of 70 or less, created a constitutionally unacceptable risk that a person with an intellectual disability would be executed. *Id*. In contrast to Florida's rule, *Briseno* did not set forth any particular IQ test score at which a person would be categorized as per se not intellectually disabled. *See Briseno*, 135 S.W.3d at 18. The Supreme Court also observed in *Hall* that in "determining who qualifies as intellectually disabled, it is proper to consult the medical community's opinions." *Hall*, 134 S. Ct. at 1993. This too is consistent with *Briseno*'s consultation of the medical community's opinions. *See Briseno*, 135 S.W.3d at 5-6 (incorporating the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders into the Court's analysis). Furthermore, the Supreme Court "noted in *Atkins*, [that] the medical community defines intellectual disability according to three criteria: significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and onset of these deficits during the developmental period." *Hall*, 134 S. Ct. at 1994. Those criteria are similar to the ones set forth in *Briseno*. *See Briseno*, 135 S.W.3d at 8. In large part, therefore, *Hall* and *Briseno* appear consistent.

It may be, however, that the factors set forth in *Briseno* should be reconsidered by this Court in a future case to determine whether those criteria can more closely resemble the Supreme Court's discussions of evidentiary considerations in *Hall*. For example, in *Hall*, the court stated,

> Pursuant to this mandatory cutoff, sentencing courts [in Florida] cannot consider even substantial and weighty evidence of intellectual disability as measured and made manifest by the defendant's failure or inability to adapt to his social and cultural environment, including medical histories, behavioral record, school tests and reports, and testimony regarding past behavior and family circumstances. This is so even though the medical community accepts that all of this evidence can be probative of intellectual disability, including for individuals who have an IQ test score above 70.

*Hall,* 134 S. Ct. at 1994. The Supreme Court indicated that persons who meet the "clinical definitions" of intellectual disability "by definition . . . have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id*. at 1999 (citations omitted). Furthermore, the court noted that the "legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework." *Id*. at 2000. *Briseno* appears to be largely consistent with the Supreme Court's acknowledgment in *Hall* that it is proper to consider the medical community's diagnostic framework in conjunction with other considerations such as adaptive skills for an ultimate legal determination by a fact finder. *See Briseno,* 135 S.W.3d at 17-18. Perhaps it may be appropriate in the near future for this Court to reexamine the parameters of the standard for intellectual disability set forth in

*Briseno* to ensure that it fully complies with the dictates in *Hall* and *Atkins*. But to the extent that applicant suggests that Texas state law for determining intellectual disability is inconsistent with *Hall*, I disagree.

Because the present application is a subsequent writ for habeas relief, before this Court may consider the merits of his complaint, applicant must establish that *Hall* is a new legal basis that meets the procedural hurdle, but he fails in this respect. *See* TEX. CODE CRIM PROC. art. 11.071, § 5(a)(1). *Hall* is not a new legal basis for applicant's challenge because that decision is largely consistent with this Court's decision in *Briseno*. To the limited extent that there may be inconsistencies, applicant's case likely would not be affected in that, in affirming the federal district court's ruling, the Fifth Circuit Court of Appeals examined the evidence, including the IQ scores and the evidence on adaptive deficits, and upheld the district court's determination that was largely based on the district court's finding that the State's expert's conclusions were more credible than applicant's experts. The federal courts considered the evidence that applicant had been declared intellectually disabled while in the Texas Youth Commission and they determined that, despite that assessment at that point in time, applicant was not intellectually disabled based on the totality of the evidence that included consideration of his adaptive skills.

The district court's factual determinations were premised on applicant's failure to show adaptive deficits that would warrant a conclusion that he is too intellectually disabled to be constitutionally executed for capital murder. The evidence that showed that applicant

did not have significant adaptive deficits included testimony that applicant could take care of himself alone as a child; could handle money; had reading scores above the tenth-grade level; successfully completed vocational training programs in prison; worked in the more challenging positions such as line leader and quality control; could operate an ultrasonic welding machine, set up electronic weighing scales and operate a forklift; received several raises in the course of his work, resulting in above-minimum wage payment; and completed the state barber exam and was one of the better students in that program. While *Hall* cautions against relying solely on a precise IQ score, the federal courts' analysis here did not rely solely on a score, but instead considered whether applicant had shown significant adaptive deficits and determined that he had failed in that burden.

### III. Conclusion

Applicant's eve-of-his-execution application relies on *Hall* as the basis for arguing that the federal courts erred in their prior determination that he failed to establish that he was too intellectually disabled to be constitutionally executed, but those courts considered the totality of the evidence of intellectual disability, including adaptive deficits, in conformity with the dictates of *Hall*. *Hall*, therefore, is not a proper basis upon which to stay this execution or grant applicant's subsequent application for habeas relief. With these comments, I join the order of this Court dismissing applicant's application for a writ of habeas corpus and denying his motion for a stay of execution.

Filed: January 27, 2015

Do Not Publish